## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JAIRO PAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL JONES, | ) | |
| RIVER JACOBS, | ) | |
| NATHAN RUNION, | ) | |
| CHRISTOPHER STEWART, | ) | |
| STEVEN DOUGLAS, | ) | |
| DEVON FLYNT, | ) | |
| KESHA STEELE, | ) | |
| CHEVELLE HUNTE, | ) | |
| JOHN HAMM, | ) | Case No.: |
| GREGORY LOVELACE, | ) | |
| WENDY WILLIAMS | ) | |
| LAGRETA MCLAIN, | ) | |
| EDWARD ELLINGTON, | ) | JURY TRIAL DEMANDED |
| CHADWICK CRABTREE, | ) | |
| WILLIAM STREETER, | ) | |
| DENICE MCKENZIE, | ) | |
| SHANNON CALDWELL, | ) | |
| CORRECTIONAL OFFICERS DOE 1–10, | ) | |
| MEDICAL STAFF DOE 1–10, | ) | |
| in their individual capacities, | ) | |
| and | ) | |
| CHS AL, LLC, d/b/a YesCare Corp., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

In May 2024, Plaintiff Jairo Pal was viciously beaten by a group of more than ten correctional officers at Limestone Correctional Facility. The officers dragged Jairo outside, beat him until he lost consciousness, and continued to beat him as he lay on the sidewalk. Jairo was in handcuffs the entire time and never posed a threat to anyone. The purpose of the beating, according to one officer, was to "teach [Jairo] a lesson." After they beat him, the officers dragged Jairo to the prison infirmary. There, despite his obviously serious injuries, the medical staff refused to send Jairo to an outside hospital or give him any medical treatment other than bandages and ibuprofen.

Jairo's beating was one of hundreds of incidents of excessive force within the Alabama Department of Corrections over the last several years; the use of excessive force at Limestone and throughout the ADOC is widespread and well-known. The supervisors at Limestone and the ADOC could disrupt the customs and policies that lead to beatings like Jairo's, discipline the officers who use excessive force against prisoners, and make clear that the use of unjustified physical force against prisoners will not be tolerated. These individuals, however, refuse to take any action. Jairo's vicious beating was the result of their inaction.

Jairo brings this action against the correctional officers who beat him and the supervisors who created and perpetuated the customs and policies that led to his beating. Every one of them violated his rights under the United States Constitution and Alabama State law.

### JURISDICTION AND VENUE

1.      Jairo brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights under the Eighth Amendment to the United States Constitution.

2.      Jairo also brings this action under Alabama State law to redress the defendants' willful, intentional, malicious, and/or deliberately indifferent breach of the duty of care they owed him to exercise ordinary and reasonable care for his protection.

3.      This Court has subject matter jurisdiction over Jairo's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

4.      This Court has supplemental jurisdiction over Jairo's state-law claims under 28 U.S.C. § 1367(a).

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) at least one defendant resides in this district, and all defendants are residents of this state.

## PARTIES

### *Plaintiff*

6.      **Plaintiff Jairo Pal** is incarcerated within the Alabama Department of Corrections ("ADOC" or "Department") at Staton Correctional Facility ("Staton") in Elmore County, Alabama. At the time of his beating, Jairo was incarcerated at Limestone Correctional Facility ("Limestone") in Limestone County, Alabama.

### <u>Correctional Defendants</u>

### *The Defendant Correctional Officers*

7.      **Defendant Michael Jones** was a correctional lieutenant at Limestone at all times relevant to this Complaint. As Lieutenant, Defendant Jones was responsible for the safety and security of all prisoners at Limestone; for monitoring and supervising security activities; and for ensuring that subordinate staff are carrying out their assigned duties and following all ADOC-wide and Limestone-specific policies and procedures. As Lieutenant, Defendant Jones had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated at Limestone. He is sued in his individual capacity.

8.      **Defendant River Jacobs** was a correctional sergeant at Limestone at all times relevant to this Complaint. As Sergeant, Defendant Jacobs was responsible for the safety and security of all prisoners at Limestone, and he had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

9.      **Defendant Nathan Runion** was a correctional sergeant at Limestone at all times relevant to this Complaint. As Sergeant, Defendant Runion was responsible for the safety and security of all prisoners at Limestone, and he had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

10.     **Defendant Christopher Stewart** was a senior correctional officer at Limestone at all times relevant to this Complaint. As a senior correctional officer, Defendant Stewart was responsible for the safety and security of all prisoners at Limestone, and he had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

11.     **Defendant Steven Douglas** was a correctional officer at Limestone at all times relevant to this Complaint. As a correctional officer, Defendant Douglas was responsible for the safety and security of all prisoners at Limestone, and he had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

12.     **Defendant Devon Flynt** was a correctional officer at Limestone at all times relevant to this Complaint. As a correctional officer, Defendant Flynt was responsible for the safety and security of all prisoners at Limestone, and he had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

13.     **Defendant Kesha Steele** was a correctional officer at Limestone at all times relevant to this Complaint. As a correctional officer, Defendant Steele was responsible for the

safety and security of all prisoners at Limestone, and she had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. She is sued in her individual capacity.

14. **Defendant Chevelle Hunte** was a correctional officer at Limestone at all times relevant to this Complaint. As a correctional officer, Defendant Hunte was responsible for the safety and security of all prisoners at Limestone, and she had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. She is sued in her individual capacity.

15. **Defendant Correctional Officer Does 1–10** were correctional officers at Limestone at all times relevant to this Complaint. As correctional officers, these defendants were responsible for the safety and security of all prisoners at Limestone, and they each had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. They are each sued in their individual capacity

16. Collectively, Defendants Jones, Rivers, Runion, Stewart, Douglas, Flynt, Steele, Hunte, and Correctional Officer Does 1–10 are referred to as the "Defendant Correctional Officers."

### *The Defendant Administrative Supervisors*

17. **Defendant John Hamm** is the Commissioner of the ADOC, the state agency that administers the prison system in Alabama. He has held that position since January 1, 2022, and he held that position at all times relevant to this Complaint. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC, and he is responsible for ensuring that ADOC employees are properly trained to perform their assigned duties and properly carry out their assigned duties. He is responsible for

setting departmental policies and customs at the ADOC and its facilities; overseeing institutional policies and customs at ADOC facilities; supervising and approving the adoption of changes in departmental and institutional policies and customs; and planning, directing, controlling, and otherwise managing ADOC facilities, to ensure the safety and security of all ADOC prisoners. He has the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Commissioner, Defendant Hamm is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

18.     **Defendant Gregory Lovelace** is the Chief Deputy Commissioner of Corrections of the ADOC. He has held that position since in or about May 2022, and he held that position at all times relevant to this Complaint. As Chief Deputy Commissioner, Defendant Lovelace is responsible for the management and oversight of all operations and administrative divisions of the ADOC and its facilities. Defendant Lovelace personally supervises the activities of the ADOC, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the prison system in Alabama, and for ensuring the effective and safe daily operations of all ADOC facilities. He has the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Chief Deputy Commissioner, Defendant Lovelace is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

19.     **Defendant Wendy Williams** was the Deputy Commissioner of Men's Services for the ADOC at the time of the events that form this basis of this Complaint. She held that position

from on or about January 6, 2022, until in or about September 2024. As Deputy Commissioner, Defendant Williams was responsible for ensuring the effective and safe daily operations of all the facilities under her supervision, including Limestone. She reported directly to Defendants Hamm and Lovelace, and she was the point person on the Department's administrative team regarding institutional security issues, including all use-of-force incidents and all uses of excessive force. As Deputy Commissioner, Defendant Williams oversaw all aspects of institutional security at the facilities under her supervision. This oversight included, among other things: reviewing use-of-force reports and investigations; reviewing facility policies and practices related to use-of-force incidents, investigations, and associated disciplinary actions; reviewing internal audit reports; reviewing facility staffing plans and overseeing facility staffing; reviewing personnel training records and practices; and monitoring and overseeing facility leadership at the facilities under her supervision to ensure compliance with all directions, regulations, and policies. Defendant Williams was responsible for addressing use-of-force incidents, including all uses of excessive force, and she had the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Deputy Commissioner, Defendant Williams was a final policymaker for the Department and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

20.    **Defendant Lagreta McClain** is a Regional Director for the ADOC. She has held that position since in or about June 2023, and she held that position at all times relevant to this Complaint. As Regional Director, Defendant McClain oversees six facilities, including Limestone, and reports to Deputy Commissioner Williams relating to male facilities. Defendant McClain is responsible for planning, monitoring, and reviewing the day-to-day operations of Limestone. Her duties include supervising Limestone's wardens; serving as a liaison between Limestone and

ADOC executive leadership; ensuring safe conditions at Limestone; and leading the external security audit team. Defendant McClain maintains frequent contact with Limestone's wardens. She also receives daily or near-daily reports from Limestone; is notified of all urgent and emergent incidents, including uses of force and uses of excessive force; and receives and reviews staffing reports, audit reports, and suggested corrective action reports. Defendant McClain reviews and approves or disapproves requests for disciplinary actions against ADOC personnel at Limestone, including all requests for corrective actions, before those requests are escalated to Defendant Williams. Defendant McClain has the duty, ability, and authority to suggest or require modifications to policies and practices at Limestone and to implement or supervise such changes as necessary to address any associated issues. As Regional Director, Defendant McClain is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the facilities she oversees. She is sued in her individual capacity.

21.    **Defendant Edward Ellington** is a Regional Director for the ADOC. He has held that position since in or about 2017. Until in or about June 2023, when Defendant McClain took over as Regional Director overseeing Limestone, Defendant Ellington oversaw Limestone as Regional Director. As the Regional Director over Limestone, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of Limestone, including supervising Limestone's wardens; serving as a liaison between Limestone and ADOC executive leadership; and ensuring safe conditions at Limestone. As the Regional Director over Limestone, Defendant Ellington maintained frequent contact with Limestone's wardens. He also received daily or near-daily reports from Limestone; was notified of all urgent and emergent incidents at Limestone, including uses of force and uses of excessive force; and received and reviewed Limestone's staffing reports, audit reports, and suggested corrective action reports. Defendant

Ellington also approved or disapproved requests for disciplinary actions against ADOC personnel at Limestone, including all requests for corrective actions, before those requests were escalated to Defendant Williams. He had the duty, ability, and authority to suggest or require modifications to policies and practices at Limestone and to implement or supervise such changes as necessary to address any associated issues. As Regional Director, Defendant Ellington is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the facilities he oversees. He is sued in his individual capacity.

22.     Collectively, Defendants Hamm, Lovelace, Williams, McClain, and Ellington are referred to as the "Defendant Administrative Supervisors."

### *The Defendant Facility Supervisors*

23.     **Defendant Chadwick Crabtree** became Correctional Warden III ("CWIII"), the head warden, of Limestone in or around May 2022, and he held that position until in or around May 2024. Defendant Crabtree reported directly to Limestone's Regional Director—either Defendant McClain or Defendant Ellington. As CWIII, Defendant Crabtree was responsible for all day-to-day operations of Limestone; the safety and security of all prisoners there; and the supervision, discipline, and training of all Limestone employees. He was responsible for adequately and appropriately monitoring, investigating, disciplining, and deterring staff misconduct, including deterring inappropriate or excessive uses of force; he was also responsible for ensuring the adequate supervision and monitoring of prisoners. He was responsible for creating, reviewing, revising, and approving all of Limestone's standard operating procedures ("SOPs"); managing, monitoring, and supervising all of Limestone's operations and personnel; and reviewing and approving all proposed staffing plans. He reviewed and approved all use-of-force reports, incident reports, shift officer reports, staffing reports, audit reports, and suggestions for corrective action; and he also remained aware of trends at Limestone, including trends related to uses of force

and uses of excessive force. He investigated uses of force and uses of excessive force; made recommendations for disciplinary or corrective actions related to uses of force; made recommendations about whether to involve the ADOC's Law Enforcement Services Division ("LESD") in any investigation; and sent those recommendations to the Regional Director. Defendant Crabtree received and reviewed the use-of-force investigations conducted by other members of Limestone's facility leadership, and he approved or disapproved any suggestions to impose disciplinary or corrective actions and/or forward to LESD for further investigation. Before becoming CWIII at Limestone, and beginning in or around February 1, 2022, Defendant Crabtree was Correctional Warden II ("CWII"), an assistant warden, at Limestone. As CWII, Defendant Crabtree had all the responsibilities and authorities that Defendant Streeter had as CWII, described in Paragraph 24 below. As both CWIII and CWII, Defendant Crabtree was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

24.    **Defendant William Streeter** was CWII at Limestone beginning in or about August 2023, and he held that position until after the events that form the basis of this Complaint. As CWII, Defendant Streeter was responsible for the day-to-day operations of Limestone, the safety and security of all prisoners there, and the supervision of all subordinate employees. He was also responsible for reviewing and assessing use-of-force incidents and investigations at Limestone; making recommendations for disciplinary or corrective actions related to uses of force; and making recommendations about whether to involve LESD in any investigation. As CWII, Defendant Streeter had the ability and authority to implement changes in Limestone's policies and practices related to, among other things, security personnel on-the-job training, supervision, and discipline. Before becoming CWII, and beginning on or about May 16, 2020, Defendant Streeter was Correctional Warden I ("CWI"), an assistant warden, at Limestone. As CWI, Defendant Streeter's

responsibilities and authorities were substantially similar to his responsibilities as CWII. As both CWII and CWI, Defendant Streeter was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

25.     **Defendant Denice McKenzie** was a correctional captain at Limestone beginning in or around 2019, and she held that position at all times relevant to this Complaint. As Captain, Defendant McKenzie was responsible for supervising all lieutenants, sergeants, correctional officers, and other correctional security staff at Limestone; she was also responsible for the safety and security of all prisoners there. She oversaw institutional operations at Limestone and reviewed shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff members were carrying out their job responsibilities. Upon information and belief, Defendant McKenzie was also specifically responsible for conducting an initial investigation of every use-of-force incident at Limestone and reporting the findings of her investigations to her supervisors. As Captain, Defendant McKenzie was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. She is sued in her individual capacity.

26.     **Defendant Shannon Caldwell** was a correctional captain at Limestone beginning in or around 2022, and he held that position at all times relevant to this Complaint. As Captain, Defendant Caldwell was responsible for supervising all lieutenants, sergeants, correctional officers, and other correctional security staff at Limestone; and he was also responsible for the safety and security of all prisoners there. He oversaw institutional operations at Limestone and reviewed shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff members were carrying out their job responsibilities. Defendant Caldwell was also specifically responsible for supervising Limestone's

Restrictive Housing Unit ("RHU"). As Captain, Defendant Caldwell was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

27.     Collectively, Defendants Crabtree, Streeter, McKenzie, and Caldwell are referred to as the "Defendant Facility Supervisors." The Defendant Administrative Supervisors and the Defendant Facility Supervisors are jointly referred to as the "Supervisory Defendants."

## Medical Defendants

### *The Defendant Medical Staff*

28.     **Defendant Medical Staff Does 1, 2, and 3** were the health care professionals on duty at Limestone when Jairo was brought to the infirmary after being assaulted by the Defendant Correctional Officers. Each of the Defendant Medical Staff Does directly observed and interacted with Jairo that night. Upon information and belief, Defendant Medical Staff Does 1, 2, and 3 were, at all times relevant to this Complaint, employees and/or agents of CHS, LLC d/b/a YesCare Corp. ("YesCare"), a corporate entity licensed to practice business in the State of Alabama. At all times relevant to this Complaint, YesCare contracted with the ADOC to provide medical care to individuals in the custody of the ADOC, including Jairo. Defendant Medical Staff Does 1, 2, and 3 were each trained healthcare professionals and were each responsible for ensuring that all inmates at Limestone, including Jairo, received minimally adequate medical care.

29.     **Defendant Medical Staff Does 7–10** were the health care professionals from whom Jairo later sought medical attention both (a) at Limestone after the night of his beating, and (b) at the other prisons where Jairo has been incarcerated since he was transferred from Limestone. Upon information and belief, Defendant Medical Staff Does 7–10 were, at all times relevant to this Complaint, employees and/or agents of CHS, LLC d/b/a YesCare Corp. ("YesCare"), a corporate entity licensed to practice business in the State of Alabama. At all times relevant to this

Complaint, YesCare contracted with the ADOC to provide medical care to individuals in the custody of the ADOC, including Jairo. Defendant Medical Staff Does 7–10 were each trained healthcare professionals and were each responsible for ensuring that all individuals in the custody of the ADOC, including Jairo, received minimally adequate medical care.

30.    Defendant Medical Staff Does 1–10 are collectively referred to as the "Defendant Medical Staff."

### *YesCare*

31.    **Defendant CHS AL, LLC d/b/a YesCare Corp. ("YesCare")** is a corporate entity licensed to practice business in the State of Alabama. At all times relevant to this Complaint, YesCare contracted with the ADOC to provide medical care to individuals in the custody of ADOC, including individuals like Jairo who were incarcerated at Limestone. As the contracted medical provider for ADOC, YesCare acted under color of state law. As a health care provider, YesCare owed Jairo a duty to treat him under the prevailing standard of care for a person with serious injuries.

### FACTUAL ALLEGATIONS

### *Jairo's Beating*

32.    In May 2024, Plaintiff Jairo Pal was incarcerated at Limestone and assigned to cell E-29. E-dorm is in Limestone's RHU, which is functionally a segregation unit. E-29 is a two-person cell, and Jairo had shared that cell with an inmate named Jabbarius Love for several months. Jairo and Love were in a consensual sexual relationship, and most of the correctional officers who worked in the RHU knew that.

33.     On or about May 24, 2024, Love called the ADOC's PREA[1] hotline and reported that he had been raped.

34.     Love had not actually been raped. For several days, he had been experiencing a mental-health crisis and telling correctional officers that he was suicidal, needed to speak with mental-health staff, and needed to go to suicide watch. None of the correctional officers took any action to get him mental-health care, an as a final attempt to get help, Love reported that he had been raped because inmates who make such reports are typically taken to see medical and mental-health staff.[2]

35.     After Love made the report, and sometime around 6:00 p.m. on the same day, Defendants Jones and Douglas came to Jairo's and Love's cell and told them both to "cuff up" and prepare to step out of the cell.

36.     Defendants Jones and Douglas cuffed Jairo with his hands in front. They told him they were taking him to the shower area at the other end of the tier.

37.     As they took him down the tier toward the shower area, Defendant Jones said to Jairo several times, "You should never have raped him, you should never have raped him."

38.     Defendants Jones and Douglas left Jairo in the shower area for about an hour as Love packed his belongings and was taken to the prison infirmary.

---

[1] PREA, the Prison Rape Elimination Act of 2003, 34 U.S.C. § 30301, *et seq.*, is a federal law designed to prevent prisoner rape, sexual abuse, and sexual harassment in all correctional institutions.

[2] This practice is widely utilized by inmates when they are unable to get help from correctional officers.

39.    Defendants Jones and Douglas eventually returned to the shower area and took Jairo back to his cell. As they did so, one or both of them called him names like "sissy," and "fuckboy." One or both of them also periodically shoved him as they walked.

40.    While walking back to Jairo's cell, Jairo got into an altercation with either Defendant Jones or Defendant Douglas. During the altercation, Defendant Jones pepper-sprayed Jairo. Defendants Jones and Douglas then half-carried and half-dragged Jairo back into his cell. Love was no longer there.

41.    Defendants Jones and Douglas took Jairo into his cell, where they continued beating him. Jairo's hands were still cuffed in front of him. Defendant Jones pepper-sprayed Jairo again. Both defendants hit Jairo with their batons, punched him in the face, and kicked him. Defendants Jones and Douglas then left Jairo's cell and locked the door.

42.    Defendants Jones and Douglas soon returned to Jairo's cell, accompanied by numerous additional correctional officers, including Defendants Flynt, Stewart, and Jacobs. Jairo was still handcuffed. He was now also covered in pepper spray. He told all the officers that his handcuffs had been tightened so much during the physical altercation with Defendants Jones and Douglas that they were cutting off the circulation to his hands.

43.    Defendant Flynt opened the door to Jairo's cell, grabbed Jairo by his shirt, pulled him out of his cell and began to push him down the tier toward the stairs to the lower level. As he was pushing Jairo, Defendant Flynt said to him, "We're going to teach you a lesson." The other officers followed, crowding around Jairo and Defendant Flynt.

44.    When Jairo and Defendant Flynt reached the stairs to the lower tier, Defendant Jacobs took over. Defendant Jacobs, who, upon information and belief, is well over six feet tall, lifted Jairo off his feet, saying that he was going to drop Jairo to the bottom of the stairs.

45.     Afraid that he would in fact be dropped or thrown down the stairs, Jairo held onto Defendant Jacobs' side as Defendant Jacobs half-carried and half-dragged Jairo down the stairs.

46.     Once they reached the ground floor, Defendant Jacobs and the other Defendant Correctional Officers present pushed Jairo out of the RHU unit and onto the sidewalk immediately outside the building. Approximately five or six more of the Defendant Correctional Officers were gathered in that area, seemingly waiting for Jairo.

47.     As they pushed Jairo outside, the Defendant Correctional Officers began to viciously and collectively beat him. The other Defendant Correctional Officers who had been waiting outside the RHU joined in the beating.

48.     Jairo's hands were still cuffed in front of him and he could barely see because of the pepper-spray residue in his eyes. Jairo did not pose any threat to the Defendant Correctional Officers or to anyone else.

49.     Nevertheless, the Defendant Correctional Officers repeatedly kicked, punched, hit, and stomped on Jairo. Soon after the beating began, Jairo was pushed or fell to the ground and lost consciousness.

50.      The Defendant Correctional Officers continued to beat Jairo after he was on the ground, as he lay on the sidewalk unconscious, including, upon information and belief, beating him with their batons on his ankles, calves, and the bottom of his feet.

51.     None of the Defendant Correctional Officers intervened or attempted to intervene to stop the others from beating Jairo.

52.     Several of the Defendant Correctional Officers then dragged Jairo to the infirmary. Upon information and belief, Jairo arrived at the infirmary at approximately 7:40 p.m.

53.    When the Defendant Correctional Officers dragged Jairo into the infirmary, it was obvious that he had been beaten severely. He was covered with blood, and he had cuts, abrasions, and open wounds on his face, arms, legs, and feet. His face and jaw were beginning to swell.

54.    Jairo regained consciousness sometime later in the infirmary shower.

### *Jairo's Denial of Medical Care*

55.    After Jairo regained consciousness, Defendant Medical Staff Doe 1 completed a body chart documenting his injuries. Jairo told Defendant Medical Staff Doe 1 that his injuries came from being beaten by correctional officers. He did not know the name of all the Defendant Correctional Officers, so he did not identify any correctional officer by name.

56.    Defendant Medical Staff Doe 2 took pictures of Jairo's injuries using a cellphone that, upon information and belief, was her personal cell phone.

57.    Defendant Medical Staff Doe 3 applied antibiotic cream and bandaged one of Jairo's cuts.

58.    None of the Defendant Medical Staff gave Jairo any additional medical treatment or performed or requested any diagnostic testing, even though Jairo had clearly suffered serious injuries, including injuries to his head.

59.    Jairo told Defendant each of the Defendant Medical Staff that he was badly hurt, and he begged them to send him to an outside hospital. They said that the Defendant Correctional Officers who brought Jairo to the infirmary had told them not to let Jairo leave the facility.

60.    Several hours later, Jairo was taken back to his cell in the RHU.

61.    Jairo had extensive injuries from the beating. He had bruises across his legs and arms and covering the bottom of one of his feet. He had a black eye and swelling on his cheek and the surrounding area. He had a laceration in one of his arms that actively bled and oozed pus for

days. He had pain and swelling around his jaw. For weeks, he had severe and near-constant headaches, he got dizzy and nauseous when he stood up, and he could not see straight.

62. He also had significant emotional injuries. He experienced frequent flashbacks and nightmares. He had near-constant severe anxiety and depression and periodically experienced panic attacks. He had difficulty sleeping.

63. Jairo requested medical and mental-health attention immediately and repeatedly. He submitted sick calls, filled out medical grievances, and asked correctional officers to take him to the infirmary. Often, his requests were completely ignored. When he was seen by medical or mental-health staff, he did not receive treatment that addressed his injuries and pain, nor was he given or scheduled for diagnostic tests to determine the full extent of his injuries. As a result, Jairo's physical and emotional pain persisted and his injuries did not heal or they healed incorrectly or insufficiently.

64. At the time of the filing of this Complaint, Jairo continues to experience physical and emotional pain from the beating and the denial of adequate medical care. He has constant pain in his jaw, face, and legs. He has difficulty walking, and his legs sometimes give out. His arms and legs often go numb. He has headaches, dizzy spells, and blurred vision. He also has frequent nightmares and flashbacks, as well as anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### The Widespread History of Excessive Force Throughout the ADOC

65. Jairo's beating was one of many excessive-force incidents that have occurred throughout the ADOC in recent years. The ADOC has a long, extensive, and well-known history of using excessive force against those entrusted to its care.

18

66.      In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions inside Alabama's prisons for men. Among other things, the investigation examined whether Alabama adequately protects its prisoners from excessive force by correctional officers.[3]

67.      During its investigation, the DOJ: (a) conducted site visits at four of Alabama's prisons for men; (b) interviewed dozens of ADOC employees, including wardens, captains, medical and mental-health staff, and high-ranking ADOC officials; (c) interviewed prisoners and their family members; and (d) reviewed hundreds of thousands of pages of the ADOC's own documents related to uses of force and employee discipline between 2015 and 2019.

68.      In July 2020, the DOJ published a report documenting its findings about the use of excessive force throughout the ADOC (the "July 2020 Report").[4]

69.      In the July 2020 Report, the DOJ stated that its investigation found "reasonable cause to believe that the correctional officers within the [ADOC] frequently use excessive force on prisoners housed throughout Alabama's prisons for men"; that the use of excessive force was "pervasive" and "pursuant to a pattern or practice"; and that "[t]he systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment."[5]

---

[3] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[4] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (July 23, 2020) ("July 2020 Report"), *available at* https://www.justice.gov/crt/case-document/file/1297031/dl.

[5] *Id.* at 1, 7.

70.    The DOJ identified several ways in which ADOC's correctional officers frequently use unconstitutional excessive force against prisoners. It found that officers:

a.    "[U]se force in the absence of a physical threat," including against "restrained or compliant" prisoners.[6]

b.    "[U]se force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others."[7]

c.    "[U]se chemical spray inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents. . . . Chemical spray is regularly used as retribution."[8]

71.    The July 2020 Report detailed many specific examples of the "frequent uses of excessive force" throughout the ADOC.[9] Many, many more uses of excessive force have occurred throughout the ADOC that were not documented in the July 2020 Report.

72.    The following are examples of excessive-force incidents that have occurred within ADOC facilities since 2017.

73.    In September 2017, a sergeant at Ventress kicked a handcuffed prisoner experiencing a medical emergency in the stomach and chest as the prisoner writhed on the floor. Another sergeant joined the beating, repeatedly hitting the prisoner in the genitals with a shoe.

74.    In April 2018, two officers at Ventress beat a handcuffed prisoner, punching him in the jaw and causing a bone fragment to break through his gums.

---

[6] *Id.* at 20.

[7] *Id.* at 14.

[8] *Id.* at 15.

[9] *Id.* at 1.

75.    In July 2018, at Staton, a handcuffed prisoner being transported to the prison's infirmary stuck his tongue out at a sergeant. The sergeant punched the prisoner in the face.

76.    In September 2018, a prisoner at Ventress accidentally dropped his food tray. An officer slapped the prisoner in the face so hard that he temporarily lost hearing in one ear.

77.    In October 2018, a prisoner at Ventress fled his dorm after getting into an altercation with several other prisoners. He found an officer and asked for help, and the officer told him to return to the dorm. When the prisoner begged the officer not to send him back to the dorm, a sergeant approached, screamed at the prisoner, and slapped him in the face.

78.    In November 2018, officers at Bibb punched and kicked a prisoner whom they suspected of possessing contraband. One officer picked the prisoner up over his head and slammed him onto a wooden bench, breaking his hip.

79.    In November 2018, a prisoner in the medical unit at Ventress was beaten by multiple officers, inducing a seizure. Other prisoners seeing the beating protested, so the officers dragged the man into another room, chained him to a bed, and continued to beat him for several hours.

80.    In February 2019, a sergeant at Elmore pulled a handcuffed prisoner off a bed, shoved him against a wall, and knocked him to the floor. The sergeant punched, kicked, and hit the prisoner with a baton so severely that the prisoner defecated himself. The sergeant then grabbed another handcuffed prisoner, repeatedly hit him with a baton and kicked him. Four other ADOC employees, including a lieutenant, watched the beatings or were nearby, but did not intervene.

81.    In 2019, an officer transporting a prisoner handcuffed the prisoner to a fence and beat him.

82.    In January 2020, a group of officers at Ventress beat a prisoner until he lost consciousness. When the prisoner woke up, they beat him unconscious again.

83.    In 2022, a lieutenant at Donaldson repeatedly beat and kicked a handcuffed prisoner, eventually beating him with a shoe.

84.    There have also been multiple incidents in which prisoners have been killed by an officer or officers' use of excessive force against them.

85.    In October 2019, a prisoner at Donaldson rushed at a correctional officer with makeshift weapons made from plastic table knives. The prisoner surrendered, was subdued, and lay face-down on the ground. Although the prisoner no longer posed a threat, the officers continued beating him: including kicking him on the head and body, beating him with batons, and picking him up and dropping him onto the floor repeatedly. The prisoner was ultimately airlifted to an outside hospital, where he died from injuries related to the beating. He had extensive brain bleeding and was found to have suffered sixteen discrete injuries to his head and neck, including fractures to his eye sockets, left ear and cheekbone, and the base of his skull.

86.    In November 2019, correctional officers at Ventress intervened in an argument between prisoners over a bag of coffee. While escorting one of the prisoners away, officers hit the prisoner and then beat him with a chair until he passed out. Officers then dragged his body into a closet and continued beating him. The prisoner was taken to an outside hospital, where he died of a traumatic brain injury caused by blunt force trauma.

87.    In January 2023, a captain at Ventress dragged a prisoner into a hallway and punched him, then handcuffed him on the ground. After handcuffing him, the captain punched the prisoner again, snapping his head against the floor. The prisoner died later that day of blunt force trauma.

88.    In December 2023 a prisoner at Limestone wore the incorrect footwear to the chow hall and was told to return to his dorm. As he complied, a correctional officer handcuffed him,

knocked him to the ground, and pepper-sprayed him in the face at close range. Multiple correctional officers then attacked the prisoner, hitting, kicking, kneeing, and beating him while he was on the ground with hands cuffed behind his back. The officers dragged the prisoner to an area outside the range of Limestone's surveillance cameras, where they continued to periodically assault him for several hours until he died.

### *The Widespread History of Excessive Force at Limestone*

89.     The use of excessive force at Limestone specifically was also common, longstanding, and well-known among ADOC personnel, including all defendants. The incidents described below are only some of the uses of excessive force at Limestone in the last several years.

90.     In October 2018, a prisoner reportedly having a mental-health crisis was screaming. Two officers responded, pepper-sprayed the prisoner, and rammed his head against a bed rail and a wall several times.

91.     In 2019, two officers knocked a prisoner to the ground. The prisoner hit his head as he fell, and the officers then pepper-sprayed, punched, and kicked him. The prisoner suffered a traumatic brain injury and permanent hearing loss.

92.     In October 2019, an officer pepper-sprayed a prisoner while the prisoner was inside a lockup cell. Another officer handcuffed the prisoner, removed him from his cell, then slammed his head into a wall, knocking him unconscious. The prisoner suffered a laceration to his ear that required sixteen stitches.

93.     In February 2021, a prisoner in a lockup cell attempted repeatedly to get officers' attention. Two times, officers pepper-sprayed directly into the prisoner's cell. The officers later handcuffed the prisoner and took him to the infirmary. On the way, one officer grabbed the prisoner by the back of the neck and slammed his head into a wall twice.

94.    Also in February 2021, a prisoner asked an officer for his breathing treatment. The officer responded by pepper-spraying the prisoner and hitting him. Later, the officer returned, placed the prisoner in handcuffs and leg restraints, and took him outside. There, the officer shoved the prisoner to the ground and beat him with a stick.

95.    In March 2021, a prisoner and an officer got into a physical altercation. The prisoner was subdued, and his hands were cuffed behind his back. Several officers then beat the prisoner while a lieutenant watched.

96.    Also in March 2021, a prisoner refused to comply with a lockdown order. An officer punched him in the face.

97.    In February 2022, a prisoner asked for cleaning supplies to clean his cell. An officer punched him in the face.

98.    In August 2022, an officer beat a prisoner while the prisoner was trying to go to his job in the kitchen. The prisoner required four staples and six stitches in the back of his head.

99.    In April 2023, an officer hit a prisoner in the stomach with his baton. The officer then handcuffed the prisoner and slammed the prisoner's head into a wall.

100.    In August 2023, two officers beat a prisoner after they discovered him in a dorm he was not assigned to.

101.    In September 2023, two officers threw a prisoner to the ground and rubbed his face into the gravel. The prisoner was handcuffed and in belly chains at the time.

102.    In October 2023, two correctional officers escorted an elderly, compliant prisoner to a location out of the range of Limestone's surveillance cameras. They instructed the prisoner to face the wall, then beat him with a broom handle until he lost consciousness, and continued to beat

him as he lay unconscious on the ground. The prisoner nearly died from a brain bleed and traumatic brain injury.

***Overcrowding and Understaffing Contributes to the Frequent Use of Excessive Force***

103.    The DOJ's investigation found that the severe overcrowding and understaffing in Alabama's prisons contributed to the pattern of excessive force.[10]

104.    The combination of overcrowding and understaffing causes "officers to feel outnumbered by prisoners and improperly resort to uses of force without justification, believing such disproportionate responses are the only effective method for maintaining safety and security."[11]

105.    And because of understaffing, existing staff are frequently required to work overtime. Regularly working extended overtime can make it difficult for officers "to maintain a calm, professional approach in situations requiring deescalation."[12]

106.    Limestone incarcerates some of Alabama's most dangerous offenders, amplifying these effects. And, at the time of Jairo's beating and in the years before, Limestone was severely overcrowded and dangerously understaffed.

107.    Limestone was designed to incarcerate 1,628 prisoners. During the calendar year of 2021, it incarcerated an average of 1,865 prisoners, operating that year at 115% capacity.

108.    In 2022, Limestone's average population increased to 2,288 prisoners, meaning that it operated on average that year at 140% of its designed capacity.

---

[10] July 2020 Report at 1–2 ("The severe and pervasive overcrowding increases tensions and escalates episodes of violence between prisoners, which lead to uses of force. At the same time, the understaffing tends to generate a need for more frequent uses of force than would otherwise occur if officers operated at full strength.").

[11] *Id.*

[12] *Id.* at 21.

109.   By 2023, its average population had risen to 2,332 prisoners, operating on average at 143% of its designed capacity.

110.   And in May 2023, when Jairo was beaten, approximately 2,322 prisoners, 142% of Limestone's designed capacity, were incarcerated there.

111.   Limestone's overcrowded facility is, in contrast, staffed with considerably fewer correctional officers than it requires to operate safely.

112.   According to the ADOC, Limestone requires between 368 and 371 full-time correctional officers to operate safely.[13] At the time of Jairo's beating and for years before, Limestone never even came close to employing that amount of correctional officers.

113.   During the calendar year of 2021, the ADOC reported that Limestone employed an average of only 192.125 full-time correctional officers—or 52% of the officers it required.

114.   In 2022, Limestone's correctional staffing decreased further. During that year, it employed an average of only 40%, or 150.125, of its necessary full-time correctional officers.

115.   And by 2023, Limestone's correctional staffing levels were even lower. That year, the ADOC reported that Limestone employed an average of only 35%, or 136.875, of its necessary full-time correctional officers.

116.   For the quarter that included May 2023, when Jairo was beaten, Limestone's correctional staffing was even lower: it reported employing an average of only 124 full-time correctional officers—approximately 33% of the officers it required.

117.   The overcrowding and understaffing at Limestone at the time of Jairo's beating further increased the risk that he would be subjected to excessive force.

---

[13] For all of 2021 and through March 2023, the ADOC reported that Limestone required 368 full-time correctional officers to operate safely. For the quarter ending in June 2023, the ADOC changed that number to 370.41.

### *The Supervisory Defendants Knew of the Frequent Use of Excessive Force Across the ADOC and at Limestone Specifically*

118.    Because of their positions in the ADOC, each of the Supervisory Defendants knew of the widespread history of excessive force across the ADOC and at Limestone specifically.

119.    Because of their positions within the ADOC, each of the Supervisory Defendants was familiar with the content and findings of the DOJ's July 2020 Report, including its findings that (a) "Alabama does not properly prevent and address unconstitutional uses of force in its prisons, fostering a culture where unlawful uses of force are common"[14] and (b) the severe overcrowding and understaffing in Alabama's prisons contributed to the pattern of excessive force.

120.    Each of the Supervisory Defendants job responsibilities required him or her to: (a) review Limestone's use-of-force reports and investigations; (b) review and approve or disapprove the recommendations stemming from use-of-force investigations; (c) be familiar with trends related to use-of-force incidents, investigations, and associated employee discipline at Limestone; and (d) be familiar with correctional staffing and prisoner population levels at Limestone.

121.    As a result, each of the Supervisory Defendants knew of the conditions described in Paragraphs 65–121 above.

### *The Supervisory Defendants Failed to Respond Reasonably to the Frequent Use of Excessive Force at Limestone*

122.    Because of their positions in the ADOC, each of the Supervisory Defendants had the duty, ability, and authority to reduce the incidence of excessive force at Limestone. Nevertheless, each of the Supervisory Defendants failed to take reasonable action to do so.

---

[14] July 2020 Report at 3.

123.    Because of their positions within the ADOC, each of the Supervisory Defendants was responsible for knowing Limestone's policies and practices related to use-of-force incidents and investigations at Limestone and for ensuring that these policies and practices adequately protected prisoners at Limestone from unconstitutional uses of force. Each of the Supervisory Defendants also had the duty, ability, and authority to create and/or modify policies and procedures at Limestone in ways that would have reduced the incidence of excessive force at Limestone.

124.    Among other things, each of the Supervisory Defendants:

a.    had the duty, ability, and authority to suggest, implement, or require modifications to Limestone's policies and practices related to use of force incidents and investigations in ways that would minimize the frequency and/or severity of excessive-force incidents at Limestone;

b.    had the duty, ability, and authority to suggest, implement, or require modifications to Limestone's policies and practices about correctional-officer staffing in ways that would minimize the extent to which understaffing increased the risk of excessive force; and

c.    had the duty, ability, and authority to suggest, implement, or require modifications to Limestone's policies and practices about prisoner placement, housing, and monitoring in ways that would minimize the extent to which understaffing increased the risk of excessive force.

125.    Each of the Supervisory Defendants was also responsible for ensuring that Limestone's correctional officers fulfilled their duty of maintaining the safety and security of prisoners at Limestone. This responsibility specifically included ensuring that Limestone's

correctional officers were adequately trained, supervised, and disciplined related to appropriate uses of force against inmates at Limestone.

126.    And each of the Supervisory Defendants had the duty, ability, and authority to supervise, train, and/or discipline correctional officers in ways that would reduce the incidence of excessive force at Limestone. Each of the Supervisory Defendants could have done so by (a) supervising, training, and/or disciplining an offending correctional officer directly; (b) instructing the Supervisory Defendant's subordinate or subordinates to supervise, train, and/or discipline an offending correctional officer; or (c) suggesting, implementing, and/or enforcing policies and practices that resulted in the supervision, training, and/or discipline of correctional officers who engaged in excessive force.

127.    The Supervisory Defendants nevertheless failed—both individually and collectively—to take the above or any other reasonable corrective action to reduce the risk of excessive force by correctional officers at Limestone.

128.    Each of these failures described above, as well as other failures by the Supervisory Defendants that are yet unknown, caused Jairo's beating.

## CAUSES OF ACTION

### COUNT I
#### VIOLATION OF THE EIGHTH AMENDMENT – EXCESSIVE FORCE
#### Against the Defendant Correctional Officers

129.    Plaintiff incorporates by reference Paragraphs 1–16 and 32–64 of this Complaint.

130.    Each of the Defendant Correctional Officers was responsible for ensuring the safety and security of all prisoners at Limestone, including Plaintiff.

131.    Instead, the Defendant Correctional Officers used excessive, unnecessary, and unlawful force against Plaintiff when they dragged him out of the RHU; individually and

collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

132.    In beating Plaintiff, the Defendant Correctional Officers acted maliciously and sadistically with the intent to cause harm, not in a good-faith effort to maintain or restore discipline. These motives are demonstrated by several facts, including: (a) Plaintiff was handcuffed and suffering the effects of having been pepper-sprayed when the Defendant Correctional Officers beat, kicked, and hit Plaintiff with their fists and batons; (b) Plaintiff did not pose any threat to the person or property of another when the Defendant Correctional Officers beat him; (c) the sheer number of Defendant Correctional Officers meant that the Defendant Correctional Officers could easily subdue Plaintiff with minimal force if necessary; and (d) the Defendant Correctional Officers continued to beat Plaintiff after he was unconscious and, thus, physically incapable of resisting.

133.    As a direct and proximate result of the Defendant Correctional Officers' use of excessive force, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### COUNT II
#### VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO INTERVENE
#### Against the Defendant Correctional Officers

134.    Plaintiff incorporates by reference Paragraphs 1–16 and 32–64 of this Complaint.

135.    Each of the Defendant Correctional Officers was responsible for ensuring the safety and security of all prisoners at Limestone, including Plaintiff. Each of the Defendant Correctional Officers was therefore obligated to take reasonable actions to prevent Plaintiff from being

subjected to excessive force by other correctional officers, including by intervening to stop the use of excessive force against Plaintiff.

136.    Each of the Defendant Correctional Officers observed the other Defendant Correctional Officers using excessive, unnecessary, and unlawful force against Plaintiff when the Defendant Correctional Officers dragged Plaintiff out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

137.    Each of the Defendant Correctional Officer had the duty, ability, and authority to stop or mitigate the other Defendant Correctional Officers' use of excessive, unnecessary, and unlawful force against Plaintiff.

138.    Nevertheless, each of the Defendant Correctional Officer took no action at all to stop or mitigate the other Defendant Correctional Officers' assault of Plaintiff.

139.    As a direct and proximate result of the Defendant Correctional Officers' failure to intervene in the use of excessive force against Plaintiff, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### COUNT III
**VIOLATION OF THE EIGHTH AMENDMENT – SUPERVISORY LIABILITY**
**Against the Supervisory Defendants**

140.    Plaintiff incorporates by reference Paragraphs 1–27, 32–54, and 65–128 of this Complaint.

141.    Through the actions described in Paragraphs 32–54 above, the Defendant Correctional Officers violated Plaintiff's clearly established Eighth Amendment rights when they dragged him out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

142.    Because of their positions within the ADOC, including their duties, responsibilities, ranges of knowledge, and domains of authority, as described more fully and specifically for each of the Supervisory Defendants in Paragraphs 17–27 and 118–28 above, each of the Supervisory Defendants knew of the widespread history of correctional officers' uses of excessive force against prisoners at Limestone and nevertheless failed to take any corrective action to minimize such uses of force.

143.    Because of their positions within the ADOC, as described more fully and specifically for each of the Supervisory Defendants in Paragraphs 17–27 and 118–28 above, each of the Supervisory Defendants had the duty, ability, and authority to take action that would have minimized the use of excessive force against prisoners at Limestone, but each of the Supervisory Defendants nevertheless failed to take any action to minimize such uses of force.

144.    The failure by each of the Supervisory Defendants to take any action to minimize the use of excessive force against prisoners at Limestone was done with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners at Limestone, including Plaintiff, and was objectively unreasonable.

145.    As a result of each of the Supervisory Defendants' failures described above, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss,

neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

**COUNT IV**
**STATE LAW NEGLIGENCE**
**Against the Defendant Correctional Officers**

146.    Plaintiff incorporates by reference Paragraphs 1–16 and 32–54 of this Complaint.

147.    Each of the Defendant Correctional Officers owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

148.    Each of the Defendant Correctional Officers breached the standard of care they owed to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, when they dragged Plaintiff out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

149.    As a direct and proximate result of the Defendant Correctional Officers' breach of the duty of care they owed to Plaintiff, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

150.    The risks and harms that the Defendant Correctional Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant Correctional Officers owed to Plaintiff.

<u>**COUNT V**</u>
**STATE LAW NEGLIGENCE**
**Against the Supervisory Defendants**

151.    Plaintiff incorporates by reference Paragraphs 1–27, 32–54, and 65–128 of this Complaint.

152.    Each of the Supervisory Defendants owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

153.    Each of the Supervisory Defendants breached the standard of care they owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force within Limestone.

154.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owed to Plaintiff, the Defendant Correctional Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, dragged Plaintiff out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

155.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owed to Plaintiff, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

156.    The risks and harms that the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owed to Plaintiff.

## COUNT VI
### STATE LAW WANTONNESS
### Against the Defendant Correctional Officers

157.    Plaintiff incorporates by reference Paragraphs 1–16 and 32–54 of this Complaint.

158.    Each of the Defendant Correctional Officers owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

159.    Each of the Defendant Correctional Officers breached the standard of care they owed to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, when they dragged Plaintiff out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

160.    The Defendant Correctional Officers' breach of the duty they owed to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals incarcerated in Limestone.

161.    As a direct and proximate result of the Defendant Correctional Officers' breach of the duty of care they owed to Plaintiff, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

162.    The risks and harms that the Defendant Correctional Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant Correctional Officers owed to Plaintiff.

<u>**COUNT VII**</u>
**STATE LAW WANTONNESS**
**Against the Supervisory Defendants**

163.    Plaintiff incorporates by reference Paragraphs 1–27, 32–54, and 65–128 of this Complaint.

164.    Each of the Supervisory Defendants owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

165.    Each of the Supervisory Defendants breached the standard of care they owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force within Limestone.

166.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owed to Plaintiff, the Defendant Correctional Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, dragged Plaintiff out of the RHU; individually and collectively beat him with their hands, feet, and batons until he lost consciousness; and continued to beat him as he lay on the ground, as described more fully above.

167.    The Supervisory Defendants' breach of the duty they owed to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals incarcerated in Limestone.

168.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owed to Plaintiff, Plaintiff suffered serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to

experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

169.    The risks and harms that the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owed to Plaintiff.

## COUNT VIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against the Defendant Correctional Officers

170.    Plaintiff incorporates by reference 1–16 and 32–54 of this Complaint.

171.    The Defendant Correctional Officers' actions, as fully described above, were both extreme and outrageous.

172.    Through their actions, the Defendant Correctional Officers intended to cause, or acted in reckless disregard of the probability that they would cause, severe emotional distress to Plaintiff.

173.    The Defendant Correctional Officers' actions, as fully described above, were undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights, and with the very intention of causing harm.

174.    As a direct and proximate result of the Defendant Correctional Officers' actions, Plaintiff suffered actual, foreseeable, and intended harm, as described in this Complaint, including serious physical injuries and acute pain at the time of and immediately after the beating; continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

## COUNT IX
**VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO PROVIDE MINIMALLY
ADEQUATE MEDICAL CARE
Against Defendant Medical Staff Does 1–3**

175.     Plaintiff incorporates by reference Paragraphs 1–6 and 28–64 of this Complaint.

176.     Defendant Medical Staff Does 1–3 were responsible for providing Plaintiff with minimally adequate medical care while he was incarcerated at Limestone.

177.     As described above, Defendant Medical Staff Does 1–3 knew that Plaintiff had serious medical needs and faced a substantial risk of harm if his serious medical needs were not met. Nonetheless, Defendant Medical Staff Does 1–3 refused to treat Plaintiff's serious medical needs and refused to ensure that someone else treated Plaintiff's serious medical needs.

178.     For example, Defendant Medical Staff Does 1–3, both individually and collectively, failed to treat Plaintiff's obviously severe medical injuries with more than bandages and ibuprofen.

179.     Additionally, Defendant Medical Staff Does 1–3, both individually and collectively, refused to send Plaintiff to an outside hospital or request authorization to do so, even though they each knew that Plaintiff had suffered known and unknown serious injuries, including injuries to his head, face, and bones.

180.     Because of Defendant Medical Staff Does 1–3's failures, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### COUNT X
#### VIOLATION OF THE EIGHTH AMENDMENT – DENIAL OF OR DELAY IN ACCESS TO MEDICAL CARE
**Against the Defendant Correctional Officers**

181.    Plaintiff incorporates by reference Paragraphs 1–16 and 32–64 of this Complaint.

182.    The Defendant Correctional Officers were responsible for ensuring that Plaintiff had access to minimally adequate medical care while he was incarcerated at Limestone.

183.    As described above, the Defendant Correctional Officers knew that Plaintiff had serious medical needs and that Plaintiff faced a substantial risk of harm if his serious medical needs were not met.

184.    Nonetheless, the Defendant Correctional Officers took affirmative action to prevent Plaintiff from receiving minimally adequate medical care for his serious medical needs.

185.    For example, the Defendant Correctional Officers directed the Defendant Medical Staff, both individually and collectively, to refuse to send Plaintiff to an outside hospital for diagnosis and treatment or request authorization to do so.

186.    Because of the Defendant Correctional Officers' actions, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### COUNT XI
#### VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO PROVIDE MINIMALLY ADEQUATE MEDICAL CARE
**Against Defendant Medical Staff Does 7–10**

187.    Plaintiff incorporates by reference Paragraphs 1–6 and 28–64 of this Complaint.

188.    Defendant Medical Staff Does 7–10 were responsible for providing Plaintiff with minimally adequate medical care while he was incarcerated at Limestone.

189.    As described above, Defendant Medical Staff Does 7–10 knew that Plaintiff had serious medical needs and faced a substantial risk of harm if his serious medical needs were not met. Nonetheless, Defendant Medical Staff Does 7–10 refused to treat Plaintiff's serious medical needs and refused to ensure that someone else treated Plaintiff's serious medical needs.

190.    Because of Defendant Medical Staff Does 7–10's failures, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

## COUNT XII
### VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO PROVIDE MINIMALLY ADEQUATE MEDICAL CARE
### Against Defendant YesCare

191.    Plaintiff incorporates by reference Paragraphs 1–6 and 28–64 of this Complaint.

192.    YesCare, on its own or through the final decisions of policymakers, had a policy, practice, or custom of delaying and/or denying inmates, including Plaintiff, access to necessary medical care in order to minimize costs.

193.    YesCare, on its own or through the final decisions of policymakers, had a policy, practice, or custom of delaying and/or denying inmates, including Plaintiff, access to necessary medical treatment in an effort to discourage them from seeking medical treatment in the future, and with the primary goal of minimizing costs

194.    YesCare, on its own or through the final decisions of policymakers, had a policy, practice, or custom of deciding whether to send inmates, including Plaintiff, to an outside hospital for medically necessary diagnosis or treatment based on cost rather than medical necessity, and with the primary goal of minimizing costs.

195.    Pursuant to these policies, the Defendant Medical Staff and/or other YesCare medical staff failed to treat Plaintiff's serious injuries immediately after his beating and continually refused to provide Plaintiff with adequate treatment or diagnosis of his ongoing serious medical needs caused by his beating.

196.    Because of YesCare's policies, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

## COUNT XIII
### MEDICAL MALPRACTICE
### Against the Defendant Medical Staff

197.    Plaintiff incorporates by reference Paragraphs 1–6 and 28–64 of this Complaint.

198.    As health care providers, the Defendant Medical Staff owed Plaintiff a duty to treat him under the prevailing standard of care for a person with serious medical needs.

199.    As described above, the Defendant Medical Staff violated the prevailing standard of care by refusing to send Plaintiff to an outside hospital for sufficient diagnosis and treatment of his serious injuries; refusing to treat Plaintiff's serious injuries with more than bandages and ibuprofen; continually refusing to provide Plaintiff with adequate treatment or diagnosis of his serious medical needs.

200.    Because of the Defendant Medical Staff's failures, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking; and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

### COUNT XIV
**MEDICAL MALPRACTICE**
**Against Defendant YesCare**

201.    Plaintiff incorporates by reference Paragraphs 1–6 and 28–64 of this Complaint.

202.    As a health care provider, Defendant YesCare owed Plaintiff a duty to treat him under the prevailing standard of care for a person with serious medical needs.

203.    As described above, the Defendant Medical Staff violated the prevailing standard of care by refusing to send Plaintiff to an outside hospital for sufficient diagnosis and treatment of his serious injuries; refusing to treat Plaintiff's serious injuries with more than bandages and ibuprofen; continually refusing to provide Plaintiff with adequate treatment or diagnosis of his serious medical needs.

204.    YesCare, through the actions of the Defendant Medical Staff and/or other YesCare health care providers described above in Paragraphs 30, 55–64, and 187–89 violated the prevailing standard of care.

205.    YesCare, through the policies described above in paragraphs 192–94 violated the prevailing standard of care.

206.    As a result, Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating were untreated, and Plaintiff continues to experience ongoing, chronic pain; has lasting memory and vision loss, neurological symptoms, and difficulty walking;

and continues to experience severe emotional distress, nightmares, flashbacks, anxiety, severe depression, hypervigilance, agoraphobia, irritability, and sensitivity to noise.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a.      Find in favor of Plaintiff on all counts;

b.      Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

c.      Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d.      Award Plaintiff attorneys' fees, prejudgment interest, and costs; and

e.      Award any other relief the Court deems appropriate.

Plaintiff demands a trial by jury.


Respectfully submitted this 15th day of December 2025.

*/s/ Susanne Emily Cordner*
Susanne Emily Cordner
(ASB-4687-C61N)
Lillian McLemore
(ASB-7561-W44E)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
lmclemore@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*